IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| MD RECYCLING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:07-CV-206 |
| | ) | |
| | ) | |
| ALLIED WASTE INDUSTRIES, INC. | ) | |
| d/b/a ALLIED WASTE SERVICES OF | ) | |
| TRI CITIES f/k/a BROWNING FERRIES | ) | |
| INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This civil action came before the court for hearing on September 10, 2007, on plaintiff's motion for a preliminary injunction [doc. 2]. Plaintiff, MD Recycling, Inc. ("MDR"), filed a verified complaint on August 24, 2007, alleging breach of contract and requesting injunctive relief [doc. 1]. At the same time MDR filed its motion for a preliminary injunction. After hearing the testimony of witnesses and the argument of counsel and considering the documentary evidence presented, the court is now prepared to rule on the motion. For the reasons stated herein, the motion for injunctive relief will be denied.

I.

*Background*

Factual

MDR is a recycling company that engages in the secondary aluminum smelting business in Midway, Tennessee. It takes scrap aluminum and through the use of salt and potassium chloride flux melts the aluminum into blocks called ingots. Waste byproducts created by the process called salt cake and baghouse ash must be disposed of by MDR. On April 1, 2006, MDR entered into a "Special Waste Services Agreement" with defendant, Allied Waste Industries, Inc. ("Allied"), to dispose of this waste.[1] This was a renewal of their relationship as MDR had exclusively used Allied's disposal services since 2002.

The contract has a six year term for the "Disposal of Special Waste" described as "Salt [C]ake and Baghouse Ash." The base rate for the first year of the contract is $17.00 per ton and increases over the term of the contract to $21.69 per ton in the sixth year. Disposal rates are subject to a sliding scale, and tonnage is calculated on a monthly basis. Article I under Terms and Conditions of the contract states:

> During the term hereof, **subject to waste approval by BFI** and availability of airspace or any periodic quantity limitations imposed by applicable law, regulation, permits or otherwise, BFI will exclusively collect, transport, process, treat, recycle and/or beneficially use and/or dispose of Customer's Special Waste as set forth above ("Services") and Customer will provide

---

[1] The record indicates that the Allied entity that entered into the contract with MDR was BFI Waste Services of Tennessee, LLC. However, for simplicity the court will refer to the defendant solely as "Allied."

such Special Waste to BFI in accordance herewith. As used herein, the "Special Waste" means the waste set forth above and meeting the descriptions in and otherwise provided to BFI in accordance with all requirements in BFI's Waste Characterization Data Form for waste approval ("WCD"); provided, however, that any conflict between descriptions of waste above and in the WCD shall be governed by the WCD; provided further, that **"Special Waste" shall exclude any amount of waste which is hazardous waste. The term "hazardous waste" as used herein shall include, <u>but not be limited to,</u> any amount of waste listed or characterized as hazardous by the United States Environmental Protection Agency or any state agency** pursuant to the Resource Conservation and Recovery Act of 1976m as amended, and including future amendments thereto, and other applicable law or regulation and any polychlorinated biphenyls (PCB's) regulated by the Toxic Substances Control Act.

Plf. Ex. 2 (emphasis added).

In a letter dated April 12, 2007, Allied informed MDR that it would no longer be accepting MDR's special waste. That letter provides in pertinent part:

> As you may know, the recent activities at the Countywide Landfill near Canton, Ohio, have drawn national attention to the management of certain industrial wastes. As a result, Allied Waste has conducted a review of all currently approved and pending special waste approvals and will no longer accept wastes with aluminum hydroxide as a constituent. These wastes include aluminum dross, sludges, filter cake, salt cake, and the associated baghouse dust from secondary aluminum production operations.
>
> Although we greatly value the relationship with our industrial waste customers, it is vital that we protect our landfill assets and the surrounding communities in which we operate. Our ability to manage these sites in accordance with environmental regulations is of utmost importance. It is for these reasons that we have decided to suspend the acceptance of secondary

aluminum production wastes effective May 15, 2007.

Plf. Ex. 4. The letter offered an alternative disposal option at a site in East Carbon, Utah. Allied agreed to dispose of MDR's waste for an additional 90 days, through August 15, 2007, at an increased rate of $45.00 per ton.

MDR has entered into an oral agreement with a competitor, Aleris, for disposal of the waste at a price of approximately $75.00 per ton. MDR is currently working on developing a process for disposing of its waste that will not require any special means of disposal. However, that alternative process is several months away from implementation.

Nature of Aluminum Waste Products

A critical factor in this case is the nature of the special waste generated by MDR. The record indicates that aluminum reacts with water and creates aluminum oxide and ammonia. The result is the production of heat and gases, primarily hydrogen and ammonia. Thus, problems can arise when salt cake and baghouse ash, which contain aluminum, come in contact with water in municipal solid waste landfills.

The Countywide Landfill situation referred to Allied's April 12, 2007 letter involved a metal/chemical fire in a municipal landfill that was the result of a chemical reaction that occurred when aluminum waste came in contact with liquids and significant amounts of gas and heat were generated. There was also a smoldering fire involving the solid waste that was co-disposed with the aluminum waste in the landfill. Def. Ex. 3.

4

At the hearing, Rich Thompson, a Senior Manager of Engineering for Allied, testified.[2] He stated that as a result of the Countywide problems, he was asked to look into Allied's practices regarding the acceptance and disposal of aluminum production waste. He identified documents from the Indiana Department of Environmental Management, Def. Ex.4, 5, and the United States Environmental Protection Agency (USEPA"), Def. Ex. 6, that were used to evaluate the aluminum waste situation. This information was used in addition to the material from the Ohio Environmental Protection Agency concerning the Countywide Landfill, Def. Ex. 2,3. These documents warn of potential problems when aluminum waste comes in contact with water in municipal solid waste landfills. Allied determined that based on this information it could not longer accept aluminum waste. Therefore Allied notified its customers of that circumstance with the letter that was sent to MDR on April 12, 2007.

Mr. Thompson also testified regarding specific findings at the Carter Valley Landfill where MDR's waste has been deposited. He reported that several gas wells had temperatures recorded above the regulatory permit level of 130° with the highest temperature recorded of 170°. This information came from monthly monitoring reports, Def. Ex. 16, and from data regarding new wells being drilled at the landfill site, Def. Ex. 15. Mr. Thompson also referenced a very recent advisory from the Ohio EPA dated July 23, 2007, containing additional information "about the characteristics of aluminum production wastes and the

---

[2] The court also relied on the "Declaration of Rich Thompson" filed with "Defendant Allied Waste Industries, Inc.'s Notice of Filing Evidentiary Materials" [doc. 10, Ex. A] in support of "Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction" [doc. 9].

potential for subsurface landfill fires." Def. Ex. 7. The advisory notes that "[i]f a landfill has accepted aluminum production waste, it is important to watch for indications of a subsurface fire." *Id*. One of the indicators to watch for according to the advisory is an "[i]ncrease in temperature in the gas extraction system (above 140° Fahrenheit); or [t]emperatures in the waste mass in excess of 170° Fahrenheit." *Id*.

Mr. Thompson testified that in his opinion the increased temperatures at the Carter Valley Landfill are a result of the aluminum waste from MDR and that the landfill is possibly at risk for a fire because of these increased temperatures. The record is clear that MDR is the only company that has submitted aluminum waste to Carter Valley for disposal.

In addition to the increased temperatures, there are also increased concentrations of ammonia in the leachate at Carter Valley Landfill. Def. Ex. 14. Mr. Thompson stated that the ammonia levels have increased three fold in the past three years and that no other waste other than the aluminum waste would account for this increase. The concern is that the ammonia could be released into the waste water treatment plant and create a series of problems.

## II.

*Analysis*

In determining whether plaintiff is entitled to a preliminary injunction, the court applies four factors.

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999) (quoting *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997)). These four factors are not prerequisites for the granting of a preliminary injunction but considerations that are to be balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). No single factor is determinative. *In re DeLorean Motor Co.*, 755 F.2d at 1229. The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits can be held. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

### Likelihood of Success on the Merits

The first factor the court will consider is the likelihood MDR will succeed on the merits of its claim. MDR has brought suit for breach of contract. It contends that Allied breached the Special Waste Services Agreement when it sent the April 12, 2007 letter stating it would no longer accept the salt cake and baghouse ash waste. Allied contends that the language of the contract gives it the right to approve waste from MDR and to decline to

7

accept waste that is hazardous.

"[T]he court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used." *Tenn. Pharmacy Coalition v. Commercial Ten*, No. M2005-01271-COA-R3-CV, 2007 WL 1217266, at *3 (Tenn. Ct. App. April 24, 2007) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "The central tenet of contract construction is that the intent of the contracting parties at the time of the executing the agreement should govern. The intent of the parties is presumed to be that specifically expressed in the body of the contract. . . ." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citations omitted).[3]

"The courts should avoid rewriting contracts for parties who have spoken for themselves and should avoid relieving parties from their contractual obligations simply because these obligations later prove to be burdensome." *Walker v. City of Cookeville*, No. M2002-01441-COA-R3-CV, 2003 WL 21918625, at *5 (Tenn. Ct. App. Aug. 12, 2003)(citations omitted). "Instead, the courts must enforce the parties' agreement according to its plain terms and must be careful not to rewrite an agreement under the guise of construing it." *Thomas & Assocs., Inc. v. Metro. Gov't of Nashville*, No. M2001-00757-COA-R3-CV, 2003 WL 21302974, at *11 (Tenn. Ct. App. June 6, 2003) (citations omitted).

---

[3] The court's jurisdiction in this case is based on diversity of citizenship. There appears to be no dispute that Tennessee law applies as the contract at issue was executed in Tennessee.

The court has reviewed the contract, particularly the language of Article I relied upon by Allied, in light of the principles of Tennessee contract law. It appears clear from the four corners of the document that the intent of the parties was for Allied to dispose of MDR's "Special Waste" described in the contract as "Salt [C]ake and Baghouse Ash." The contract language in Article I set out above is unambiguous and clear. Pursuant to that language, Allied has the right to approve MDR's waste and to decline hazardous waste. While there has been no official pronouncement by the USEPA or a state EPA that aluminum production waste is "hazardous" pursuant to the Resource Conservation and Recovery Act of 1976, the term "hazardous waste" in the contract includes "<u>but is not limited to</u>" such waste. Therefore, the court believes that the contract language permits Allied, as it did in this case, to use evidence from reliable sources, conclude that certain waste material presents a hazardous threat, and then refuse to accept that waste material in order to protect the integrity of its existing landfills. Therefore, as to the likelihood that the plaintiff will ultimately prevail on the merits of its claim for breach of contract, the court concludes that this factor weighs in favor of Allied.

<u>Irreparable Harm</u>

Next the court will consider whether MDR will suffer irreparable harm if a preliminary injunction is not granted. MDR argues that unless a preliminary injunction is issued it will be forced out of business. Mike Gill, General Manager of MDR, testified at the

hearing that MDR's aluminum waste is being disposed of by Aleris at a price of $70-$75 per ton including freight. By choice, the Mr. Gill has made the contract with Aleris an oral one. A large portion of the increase in price is to cover freight charges as Aleris is located in Kentucky. He stated that it is costing an additional $60,000-$75,000 per month to dispose of the waste using Aleris and he anticipates an shortfall of approximately $500,000 before MDR can get the new process working that will eliminate the need to dispose of the aluminum waste. Mr. Gill admitted on cross examination that he had made no effort to try and find financing to cover that shortfall. He also admitted that he could defer his salary.

MDR presently has in place a means for disposal of its waste with Aleris, though at a higher rate than with Allied. However, the remedy of monetary damages is available. Also, MDR could perhaps even temporarily cut production which would reduce the amount of waste requiring disposal and the attendant increased cost. After considering the evidence relevant to this factor, the court finds that it weighs in favor of MDR.

Substantial Harm to Others & the Public Interest

The court will consider the third and fourth factors together: whether the issuance of the injunction would cause substantial harm to others and whether the public interest would be served by issuance of the injunction. The court believes that both of the factors weigh heavily in favor of Allied. The evidence is clear and convincing that the

aluminum waste cannot be placed in municipal solid waste landfills as it has been in the past. The evidence in the record is also clear and convincing that the Carter Valley Landfill is showing the signs of aluminum waste reaction and is potentially at risk for a fire. The increased ammonia concentration also creates potential water treatment plant issues. To require Allied through issuance of a preliminary injunction to continue to dispose of MDR's waste at Carter Valley Landfill would not be in the best interest of the public or in the interest of community health and safety.

After balancing the four relevant factors, the court concludes that it is not appropriate to issue injunctive relief in this case. The court is mindful of MDR's financial circumstances and the potential harm associated therewith weighing in its favor. Nevertheless, MDR entered into the contract as it is written, and it can pursue monetary damages. The remaining factors weigh substantially in favor of Allied and the denial of the requested injunctive relief. Therefore, MDR's motion for a preliminary injunction [doc. 2] will be denied.

An order consistent with this opinion will be entered.

ENTER:

  s/ Leon Jordan  
United States District Judge